Filed 5/19/22  In re L.L. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re L.L. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>Y.D.,<br><br>    Defendant and Appellant. | G060783<br><br>(Super. Ct. Nos. 21DP0586, 21DP0600)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Isabel Apkarian, Judge.  Affirmed in part and reversed in part.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\*        \*        \*

This dependency case involves Y.D. (Mother) and her two children. Her daughter, L.L, is currently 13 years old, and her son, K.E.L., is 16 years old. Mother has sole physical custody of both. L.L. lives with Mother while K.E.L. attends boarding school in Illinois and lives there during the school year. Previously, Orange County Social Services Agency (SSA) investigated Mother in 2017 and 2020 for allegations concerning physical and emotional abuse. These prior investigations uncovered information suggesting Mother was suffering from an undiagnosed mental illness, as she exhibited paranoid and delusional behavior and was abnormally aggressive. However, SSA concluded these prior allegations of abuse were inconclusive or unfounded.

The current investigation arose after L.L. expressed suicidal thoughts and engaged in self-harm. She told SSA her emotional instability was caused by Mother's erratic behavior and pressure to excel in school. Mother refused to cooperate with SSA's investigation. She consistently denied that L.L. had any mental health issues and refused to allow L.L. to see a therapist. SSA filed a dependency petition for L.L., which was sustained. The juvenile court exercised jurisdiction over L.L. and ordered that she be removed from Mother's custody.

Around the time SSA filed its dependency petition for L.L., it learned K.E.L. had returned home for summer break and was living with Mother. SSA obtained a protective custody order for K.E.L. before speaking with him. It later filed a dependency petition for K.E.L., alleging there was a substantial risk he would suffer serious physical harm in Mother's custody. The dependency petition for K.E.L. primarily relied on allegations relating to the mental health of his sister, L.L., and past allegations of physical abuse that were uncovered in SSA's prior investigations. When interviewed during the current investigation, K.E.L. admitted Mother had physically disciplined him in the past but denied anything recent. He also did not exhibit any signs of physical abuse and wanted to go home with Mother. Still, the juvenile court sustained the petition,

2

declared K.E.L. to be a dependent of the court, and ordered that K.E.L. be removed from Mother's custody.

Mother appeals the rulings as to both children. As to K.E.L., she argues the court improperly exercised jurisdiction over him. She contends SSA's petition was facially insufficient to support jurisdiction, as it contained no allegations showing K.E.L. faced a substantial risk of serious physical harm at the time of the jurisdiction hearing. In the alternative, she claims there is insufficient evidence in the record to support jurisdiction over K.E.L. We agree with her second contention. While the record contains evidence of past physical harm, it does not show that K.E.L. currently faces a substantial risk of serious physical harm in Mother's custody.

Mother does not dispute L.L. is subject to the juvenile court's jurisdiction. Rather, she contends the trial court erred by ordering that L.L. be removed from her custody. We disagree. The record contains ample evidence that L.L. was suffering from severe emotional distress that was largely caused by Mother's abnormal behavior. Mother showed little interest in addressing these behaviors and consistently denied that L.L. had any mental health problems. Thus, it was necessary to remove L.L. from Mother's custody to protect her emotional health.

For these reasons, the order declaring K.E.L. a dependent of the juvenile court is reversed, while the order removing L.L. from Mother's custody is affirmed.

I
FACTS AND PROCEDURAL HISTORY

Both Mother and Father are originally from China and were married there in 2005. L.L. was born in 2009, and K.E.L. was born in 2005. Mother moved to the United States in 2009, while Father stayed in China. The parents divorced in 2015. Father remained in China, and Mother continued to live in the United States with full

custody of the children.[1]  Prior to the current referral, SSA had investigated the family in October 2017 and February 2020.  Those investigations are described below.

*A. Prior SSA Investigations*

*1. October 2017 Referral*

In October 2017, there was a referral to SSA for (1) alleged general neglect and physical abuse by Mother to K.E.L. (12 years old at the time), and (2) emotional abuse by Mother to K.E.L. and L.L. (8 years old at the time).  During SSA's investigation, "[b]oth children described being hit by [Mother] in the past two to three years but were inconsistent in describing possible historical injuries."  They also described "possible mental health concerns regarding [Mother]," which were allegedly causing K.E.L. to suffer anxiety.  For example, Mother made statements such as "'hurricanes in Florida are due to aliens,'" and she believed spy cameras were monitoring her.  If K.E.L. did not agree with her outlandish statements, she would become angry with him and call him a liar.  Mother would also make disparaging statements to the children when angry.  Among other things, she would tell K.E.L. "he was a mistake and shouldn't have been born and that he is a burden."

Mother refused to cooperate with SSA's 2017 investigation.  She yelled, "'I don't want to talk to you!' and hung up" the phone when SSA called.  She also refused to meet in person with any social workers, and sent a "social worker an illogical text message."  Nonetheless, SSA closed its investigation, concluding the first allegation of physical abuse was unfounded and the second allegation of emotional abuse was inconclusive.

---

[1] Since Father does not appeal and has had limited involvement raising the children, this opinion focuses on the facts pertinent to Mother.

## 2. *February 2020 Referral*

In February 2020, SSA conducted another investigation into allegations of emotional abuse against L.L. and K.E.L., who were 11 and 14 years old, respectively, at the time. The investigation was initiated following two separate reports made to SSA. Both reports described a flight Mother had taken with the children from Miami to Los Angeles. "[T]he plane was forced to land early due to [Mother] being belligerent with the flight crew. The FBI was contacted. [Mother] was set off when flight crew asked if [she] wanted a 'drink' and when the word 'okay' was said. When the words 'drink' and 'okay' [were] said, 'she [went] crazy.'" During interviews with airport police, Mother was aggressive and uncooperative and she made odd statements, including "'you are not going to save me' and 'I am not selling my kids.'" The children told the officers that "[M]other has schizophrenia, they [felt] alone and [were] taking care of themselves." K.E.L. asked for help for Mother because she refused to take her medications.

In addition to the airplane incident, one of the reports stated Mother had hit K.E.L. in 2017 with a car tool, which caused him to bleed. It was also reported that Mother "ha[d] been trying to light the furniture on fire because she [thought] there [were] ghosts on the furniture. She [lit] sage and she [broke] glass because she [felt] this [brought] peace. She [said] the children [were] 'bad people' and that she hate[d] [L.L.]"

During SSA's investigation of these reports, K.E.L. revealed he had overheard a doctor tell Mother "she might have schizoaffective disorder" a few years prior. "[M]other act[ed] crazy almost daily" and had "a lot of 'trigger words' such as 'okay,'" which she thought were part of a secret code. K.E.L. also stated that Mother had once thrown a glass vase and another glass object in his direction because she "thought he was conspiring with [Vladimir] Putin." But K.E.L. did not think Mother was aiming at him. K.E.L. denied any physical discipline other than a time "several years prior when [Mother] hit him on the head with a car tool that's used to cut seat belts in case of an emergency." The tool caused a small cut on his head that bled a little. But K.E.L. did not

5

think Mother intentionally tried to hit him with the tool, and she later apologized for the incident.

L.L. also believed Mother suffered from mental illness. But neither the children nor Father were aware of Mother ever being officially diagnosed with any condition. L.L. also disclosed that when Mother was angry, she would tell the children she did not want them, and she had also told L.L. that she hated her. Mother refused to be interviewed or cooperate with the investigation.

SSA concluded that "[d]espite [Mother's] unusual behavior and the children trying to manage [Mother], the children did not appear to be suffering serious emotional damage as a direct result of [Mother's] behavior as they presented with above average maturity, did not exhibit any significant behavioral or mood disturbances, were high achievers in school, and presented with a clear understanding of [Mother's] behavior if it were due to a mental health issue, therefore the allegation was inconclusive. [T]here did not appear to be any significant negative impact to the children, [and] there was no cause for [SSA's] further involvement . . . ."

## B. The Current Investigation

### 1. L.L.'s referral and detention

SSA began the current investigation in Spring of 2021, when L.L. and K.E.L. were 12 and 15 years old, respectively. In late April 2021, a reporting party informed SSA of potential abuse involving L.L. She often displayed withdrawn and emotional behaviors at school. She would cry uncontrollably and then act as if nothing had happened a few minutes later. Therapy had been offered to L.L., but Mother refused to provide consent. It was also reported to SSA that L.L. believed Mother was mentally unstable and was afraid of Mother.

Following the report, SSA interviewed various teachers and staff at L.L's school. Those interviewed conveyed that while L.L.'s academic performance was

6

excellent, she had poor self-esteem. She appeared "'emotionally unstable'" and had made comments that "life is not worthwhile" and "'nothing matters.'" School staff observed the words "'End Me" written on her arm, and L.L. had reportedly talked with a friend "about how 'beautiful' it would be to jump off a building." L.L. had also told school staff that she thought "about cutting her arms or punching herself as self-harm." The school talked to Mother about enrolling L.L. in therapy, but Mother refused.

SSA then made several attempts to contact Mother. It made an unannounced visit to the family home in Newport Beach. When the social worker explained the purpose of the visit and asked to speak with Mother about L.L., Mother responded, "'I'm going to call 911' and shut the door." SSA then attempted telephonic contact with Mother but was unable to reach her. SSA made another visit to the home with a police officer. Mother became upset and refused to allow SSA to interview L.L., stating "it was not legal" for the social worker to be there. When the police officer tried to convince Mother to allow an interview with L.L., she "exclaimed 'Sue me!' and 'Arrest me!'" She then "claim[ed] Social Services and the police had no right to check on the child . . . [and] slammed the door."

SSA obtained a court order to interview L.L. at school. During the interview, L.L. appeared clean, well kempt, and in good health. She had no visible marks or bruises, and she denied any physical abuse or discipline by Mother. Rather, she explained Mother yelled at her or threatened to confiscate her phone if she got into trouble. Still, L.L. asked the social worker not to tell Mother they had spoken because this would make her "life '10 times worse.'" She stated Mother did not want her "to talk to social workers or counselors because it [was] 'betraying the family.'" Mother had likewise instructed L.L. not to talk to adults that came to see her at school. As for her brother, K.E.L., L.L. reported that he was attending a boarding school in Illinois.

According to L.L., Mother has schizoaffective disorder but has refused to be diagnosed or treated. For example, she reported that Mother "get[s] 'really angry and

offended' if someone uses the terms 'Okay,' 'Beach,' or 'May.'" She also becomes "angry when she sees the color purple or sees the three-finger 'okay' symbol. [W]hen a person uses these terms or gestures, [Mother] thinks that person is 'one of them.'" L.L. did not know what that meant. L.L. also "reported . . . [Mother] believes Vladimir Putin is her boyfriend and they will soon get married."

When asked how these behaviors affected her, L.L. stated "she is 'never at ease' unless the mother is asleep." She had "'cynical thoughts' and sad feelings" and did not like herself. She also "confirmed having thoughts of suicide and self-harm" and stated she had given herself superficial wounds by scratching herself with her fingernails. A week prior to the interview, she had thought about suicide abstractly, but she denied planning a suicide attempt.

L.L. described the source of her mental health struggles as the "'prolonged buildup' due to [Mother's] behaviors, as well as the pressures of school." For example, L.L. stated she is afraid of Mother "because of her 'mood' and how quickly she can become angry. [L.L.] reported [Mother] has hit her before, so over the past few years she has learned not to argue with [Mother] and to keep the peace."

Following the interview with L.L., a social worker sent Mother a text message informing her of the interview and that L.L. had expressed suicidal thoughts. The social worker requested they meet to discuss these concerns and so Mother could be connected to resources. Mother's only response was a reply message stating, "'Go f***  yourself.'" According to L.L., Mother later "'scream[ed]' at her asking if she was suicidal." When L.L. answered affirmatively, Mother "told her that 'everyone' feels this way and that it was only the pressures of school causing this."

A protective custody order was granted on May 27, 2021. When SSA informed Mother of the order, she "made . . . politically charged statements and refused to believe the child was suicidal." L.L. was placed in the home a schoolmate. The

caregivers reported that L.L.'s demeanor improved after her placement. She was talkative and had not cried while living with them.

A few days after L.L. was removed from Mother's custody, Mother called SSA to express concern over L.L.'s current caregivers, stating L.L. was not friends with the family. Mother wanted L.L. to come back home and declared that she was now open to L.L. receiving mental health treatment. She also revealed that K.E.L. was home from boarding school and was living with her.

SSA filed a juvenile dependency petition for L.L. on June 1, 2021. The petition alleged jurisdiction was proper under Welfare and Institutions Code section 300, subdivisions (b)(1) and (c).[2] The petition alleged L.L. had suicidal thoughts and had engaged in self-harm, but Mother refused to enroll her in therapy. It further alleged Mother had unresolved mental issues and chronicled some of the alleged behaviors set forth above. A detention hearing was held two days later. The court ordered that L.L. be detained from her parents, that reunification services be provided for Mother, and that Mother be provided visitation with L.L.'s input.

*2. K.E.L.'s referral and detention*

SSA filed an application for a protective custody warrant for K.E.L. on June 2, 2021, which was granted that same day. The application documented the mental health issues of K.E.L.'s sister, L.L. It also alleged Mother had engaged "in odd behavior and ha[d] untreated Schizoaffective Disorder." The application clarified that K.E.L. had just returned home from boarding school and had not yet been interviewed by SSA. But SSA was concerned for his safety due to Mother's mental health issues and a statement made by L.L. that "[Mother's] behaviors caused [K.E.L.] to have a short temper and he eventually became 'angry' all the time."

---

[2] All further undesignated statutory references are to the Welfare and Institutions Code.

SSA filed a juvenile dependency petition for K.E.L. two days later, alleging jurisdiction was proper solely under section 300, subdivision (b)(1). The specific allegations supporting the petition are described in the analysis portion of this opinion. A detention hearing was held on June 7, 2021. SSA's report prior to that hearing stated K.E.L. was home for summer break and would return to Illinois for school in August 2021. The report also reflected that K.E.L. appeared healthy and well taken care of. There were no visible marks or bruises on his body, and he denied any physical discipline by Mother. Likewise, K.E.L. denied that Mother had made any threats to him or L.L. Rather, he felt safe at home and was unafraid of Mother. He knew how to reach emergency services in the event of an emergency.

The report also documented that Mother blamed K.E.L. for L.L.'s detention. K.E.L. said this caused an argument between the two but explained "he ha[d] learned to manage how to deal with [Mother's] behavior. [H]e did not understand why [SSA was] now getting involved if nothing was done during the 2017 investigation. [K.E.L.] mentioned that now he is able to take care of himself, his sister, and [M]other. [K.E.L.] also shared that he believes he has a 'pretty stable home' as he has learned to ignore [Mother's] behavior and agree with [her] to minimize arguments in the home." He also clarified that L.L. did not communicate with Mother to avoid conflict, but he had learned to communicate with Mother in a manner that did not upset her. Her episodes had lessened over the last few years as he learned "to speak with [Mother] without triggering her."

K.E.L. expressed a strong desire to return home to Mother, as he felt safe and happy there and "ha[d] the 'situation under control.'" Being removed from Mother's custody without his input upset him. He compared living in the children's home to being in prison and indicated that he felt less safe there than at home.

At the June 7 detention hearing, the court found there was substantial danger to K.E.L.'s physical health and there were no reasonable means to protect him

10

short of removing him from Mother's custody. SSA was ordered to provide reunification services, and Mother was awarded visitation.

*C. SSA's Reports Following Detention*

*1. Contacts with L.L.*

Following the detention hearing, SSA interviewed L.L. on June 17, 2021. She described living with Mother as "'really uncertain.'" "'[E]verything [L.L.] talked about could [cause] an outburst.'" For example, L.L. stated that "'I'll be talking about school and she'll take it and start ranting about random things, shouting, and I don't know what she is talking about.'" These outbursts occurred, "'anytime [L.L.] talk[ed] to her.' '[Y]ou can't even say the word okay. She'll start shouting and gets angry. She also gets mad at the word beach.'" L.L. also "shared that she [could] come home from school happy and [Mother] '[would] think[] [she's] happy because something bad happened to [Mother].'"

L.L. described Mother as having severe paranoia about people monitoring her. She had L.L. "'search her head and scalp for chips'" and believes "'the media knows what she's thinking.'" According to L.L., Mother also "'has a weird fascination and obsession with Russia and Putin. She really believes Putin is her boyfriend.' [SSA] asked [L.L.] if [Mother] could be joking and just saying that Putin is her boyfriend because she thinks he's handsome, but [L.L.] said, 'no.' [L.L.] then said that [Mother] believes that Putin, 'loves her and is communicating with her when he's speaking. She'll get angry and say that [L.L.'s] trying to steal Putin away from her.' [L.L.] disclosed that [Mother], 'calls [her] a whore for older men, which is disgusting and obviously wrong.'"

Similarly, L.L. divulged that Mother, when angry, calls her names in Chinese, like "'bitch and bastard.'" Mother had also called both children fat and had "sent the children to 'fat camp' in China." L.L. also stated that Mother had hit her and K.E.L. in the past and left bruises on her a few times. Mother had typically hit her with

11

an open hand slap but had also used a high heel boot, a rolling pin, a "'weird baton thingy,'" and had thrown things at her. But L.L. clarified that Mother "last hit her, 'sometime ago because I've been really careful to not make her hit me.'"

As to her own mental health, L.L. stated she felt better now that she was not living with Mother. When asked about her happiness, L.L. answered "that on a scale of one through ten, with ten being happy and one being not happy at all, she was a two or three residing with [Mother] and would be a one if her friends did not live in the neighborhood. [L.L.] shared that in her current placement, she is a seven to nine, 'because [it's] a lot better and I get to actually have fun and not argue.'" L.L. relayed an incident that occurred the day before her removal from Mother's care. She told Mother she was having thoughts of hurting herself. Mother "became angry and said, 'if you really want to then do it.'"

In September 2021, L.L.'s caregivers indicated they could not continue caring for L.L. They indicated that L.L. could stay with them for three more months while SSA searched for a new caregiver. It is unclear where L.L. is currently placed.

*2. Contacts with K.E.L.*

SSA also interviewed K.E.L. on June 17. He "said that he used to have concerns for [Mother's] mental health but, 'not as much anymore because it's mild and I've grown up.'" He stated Mother "'kind of speaks in her own ways and reacts to things or words'" and "'gets triggered'" easily. But he believed she was improving based on his review of her social media posts while he was away at boarding school. He expressed a desire "to be home with [Mother] to help encourage her to participate in mental health services." He found it hard to encourage Mother to engage in services when visitation was monitored.

As for emotional abuse, K.E.L. stated when Mother is "'really mad she will call us stupid because we really bug her. . . . [K.E.L.] said that the mother has called his

12

sister, [L.L.], 'bad' and 'really mean' names in Chinese. [K.E.L.] said that [Mother] has called him and [L.L.] fat, 'but that's only to motivate [him] to get skinny because [he was] fat. But [he] also told her to stop.'" When describing his mental health, K.E.L. "shared that on a scale of one through ten, with ten being happy and one not happy at all; he felt that he was a nine, while living with the mother. [K.E.L.] said that in his current placement he was a three . . . ." As to physical abuse, K.E.L. stated Mother hit the children "when they were young, but that, 'those are traditional ideals in China. Not to hurt [them].'"

K.E.L. returned to his boarding school in Illinois after summer break. In September 2021, the boarding school informed SSA that Mother had unauthorized contact with K.E.L. She was with K.E.L. when he moved back into his dormitory for the start of the school year.

### 3. Contacts with Mother

Mother reached out to SSA on June 24, 2021. She left a voicemail in which she was cooperative and apologetic for her prior actions. But her voicemail also asserted that "[L.L.'s] mental health [was] good" and L.L. had "no intention on suicide." As such, Mother believed there was no need to be concerned with L.L.'s mental health anymore.

SSA interviewed Mother on June 28. At the interview, she stated L.L. showed no signs of depression. She believed L.L. was joking when she discussed jumping off a building, and she denied telling L.L. to kill herself and thought L.L. had misunderstood her. Still, she admitted getting calls from the school expressing concerns as to L.L.'s mental state. She stated that "in her country, mental health is taboo and that is why she [was] in denial about [L.L.'s] mental health."

Mother denied ever being diagnosed with a mental illness. In explaining why certain words triggered her, Mother stated she had learned the "okay" hand gesture

13

and "the word 'okay' refer[] to a woman's private part," and "she does not like the word beach because it is very close to the word Bitch." She also stated, "the color purple is considered to be, 'toxic blood out of the heart and negative.'" But she denied that seeing the color made her angry. "With regards to Vladimir Putin, [Mother] said that, 'I like him. I personally really like him. I admire him.' When asked again if she believed she was in a relationship with him, the mother said, 'I like him.'" Mother also expressed a willingness to participate in services.

A few weeks after the interview, Mother provided SSA with a psychiatric evaluation dated July 16, 2021. The evaluation found Mother had "adult adjustment reaction with some anxiety and depression. [But] [t]here [was] no evidence of schizoaffective disorder or schizophrenia" and "[n]o need for medications at present." The evaluation also stated a physician assistant had previously diagnosed Mother as possibly having schizophrenia. The psychiatrist conducting the evaluation tried to contact the physician assistant regarding this diagnosis but was unsuccessful.

Mother's cooperative attitude later evaporated. On July 22, 2021, Mother send SSA a text message stating, "You should [have] received my no mental issue report from my Psychiatrist from the Court, also Lily is not mental illness, so I didn't neglect. You lied, I don't trust you anymore, I refuse to be abused by your agent anymore. [¶] Fool me once is your fault, fool me twice is my fault, I am always faultless, you want 4 more months fun meeting me call me? Perfect . . . plan finished, mission accomplished. I am glad my kids found new mamas. 18 is Okay with Me."

SSA conducted an announced visit at Mother's home on August 5, 2021. Mother showed SSA a certificate she earned for completing a parenting course the prior month. However, she only took one anger management class then stopped attending after learning the classes had not been specifically ordered by the court. Mother stated "she [did] not have anger issues and . . . the anger management 'classes [were a]

14

humiliation.'"  Likewise, she denied having any mental illness and refused to attend individual counseling sessions.

On September 2, 2021, a social worker contacted Mother to schedule a compliance visit.  Mother sounded angry, refused to meet with the social worker, and stated she was currently living in Chicago.

*D. Joint Jurisdiction Hearing for K.E.L. and L.L.*

On September 23, 2021, a joint jurisdiction hearing was held for both L.L. and K.E.L.  L.L. did not attend, while K.E.L. attended remotely.  At the hearing, Mother's attorney revealed that L.L. had declined to visit Mother for the month and a half leading up to the hearing.  Mother's attorney also confirmed Mother was living in Illinois.  She stated if L.L. was returned to Mother's care, Mother would return to California to take care of L.L.  If L.L. remained out of Mother's custody, Mother would split time between California and Illinois.

Unlike his sister, K.E.L. liked visiting Mother.  His attorney informed the court that K.E.L. wanted to return home and that K.E.L. believed he could manage Mother and make things work.  However, K.E.L.'s attorney disagreed with his client and agreed with SSA's recommendation.  Among other things, he was concerned by Mother's failure to utilize the offered services, particularly, her refusal to attend counseling.

After hearing from the parties, the court sustained both petitions, declared both children to be dependents of the court, and ordered that the children remain removed from Mother's custody.  Separate written orders were issued for each child.

Mother appeals both orders.  As to K.E.L., Mother argues SSA's petition was insufficient as a matter of law, and, in the alternative, she contends the court's jurisdiction finding is not supported by substantial evidence.  As to L.L., Mother does not contest that she is subject to the juvenile court's jurisdiction.  Rather, she maintains the court erred by ordering that L.L. remain removed from her care.

15

II

DISCUSSION

*A. SSA's Motion to Dismiss*

On April 1, 2022, SSA filed a request for judicial notice of a dependency court order returning K.E.L. to Mother's care and terminating his dependency proceedings (the termination order). It later requested judicial notice of the final judgment in K.E.L.'s case. We grant both requests. (Evid. Code, § 452, subd. (d).) Concurrent with its request for judicial notice of the termination order, SSA also filed a motion to dismiss Mother's appeal as to K.E.L. on mootness grounds. We requested that Mother file a response to SSA's motion, which she did on April 11.

"Generally, termination of juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.] 'However, dismissal for mootness in such circumstances is not automatic, but "must be decided on a case-by-case basis."' [Citation.] '[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error.'" (*In re Emily L.* (2021) 73 Cal.App.5th 1, 13–14 (*Emily L.*)) For example, appellate courts have discretion to consider the merits of a parent's appeal if the order could have consequences for the parent beyond jurisdiction. (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)

Mother opposes SSA's motion to dismiss. Though K.E.L.'s dependency proceeding has been terminated, she argues that if we do not address her appeal, there is a reasonable risk she will be added to the Child Abuse Centralized Index (CACI). Under the Penal Code, SSA is required to "forward to the Department of Justice a report in writing of every case it investigates of known or suspected child abuse or severe neglect that is determined to be substantiated." (Pen. Code, § 11169, subd. (a).) "If a report has previously been filed which subsequently proves to be not substantiated, the Department

16

of Justice shall be notified in writing of that fact and shall not retain the report." (Pen. Code, § 11169, subd. (a).)

A person listed in the CACI database has a right to a hearing to challenge their inclusion. (Pen. Code, § 11169, subd. (d).) Significantly, though, such a hearing "shall be denied when a court of competent jurisdiction has determined that suspected child abuse or neglect has occurred." (Pen. Code, § 11169, subd. (e).) Although data in CACI is confidential, it may be disclosed to "[a]uthorized persons or entities making inquiries for purposes such as employment, licensing, adoption or child placement," among others. (Cal. Code Regs., tit. 11, § 905, subd. (b).)

In *Emily L.*, the minor turned 18 while her mother's appeal of the dependency court's jurisdictional order was pending, terminating the juvenile court's jurisdiction. (*Emily L.*, *supra*, 73 Cal.App.5th at pp. 4, 13-14.) The child protection agency moved to dismiss the appeal as moot, which the appellate court denied. (*Id.* at pp. 13-14.) Because the conduct alleged in the sustained petition "reasonably [fell] within the definition of child abuse, [the mother was] at risk of inclusion in CACI." (*Id.* at p. 15.) As such, the court found "she ha[d] demonstrated prejudice sufficient to warrant a discretionary review of the jurisdictional findings." (*Ibid*.)

Similarly, the allegations in SSA's sustained petition for K.E.L. appear to fall within the definition of "child abuse," which "includes physical injury or death inflicted by other than accidental means upon a child by another person." (Pen. Code, § 11165.6.) As set forth in further detail below, SSA alleged Mother had hit K.E.L. in the head with a metal tool and had thrown two glass objects at him. Like the court in *Emily L.*, we exercise our discretion to consider the appeal as to K.E.L. Mother should not have to face any risk of inclusion on CACI simply because the juvenile court terminated jurisdiction before we had the opportunity to review the propriety of the underlying order.

17

Further, other appellate courts have found that "recordation in CACI as a probable child abuser impinges upon fundamental rights." (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 84-85.) Yet, by dismissing this case as moot, Mother would likely lose any right to challenge her potential inclusion in CACI. (Pen. Code, § 11169, subd. (e); see *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1005 ["involuntary dismissal of an appeal operates as an affirmance of the [challenged order]"].) This is an unreasonable result. While Mother could potentially still be included in CACI due to L.L.'s dependency proceedings, that should not foreclose her from challenging her inclusion based on alleged acts relating to K.E.L.[3]

*B. Jurisdiction over K.E.L.*

On appeal, Mother argues SSA's petition was facially insufficient to support an exercise of jurisdiction. And even if the petition is legally valid, Mother claims there is insufficient evidence in the record to support a jurisdictional finding. We agree with her second contention.

SSA's petition for K.E.L. asserted jurisdiction was proper based solely on section 300, subdivision (b)(1). "A jurisdiction finding under section 300, subdivision (b)(1), requires [SSA] to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious *physical harm* or illness or a substantial risk of serious *physical harm* or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601, italics added.) "As appellate courts have repeatedly stressed, '"[s]ubdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the

---

[3] We note that our Supreme Court is currently reviewing "whether an appeal of a juvenile court's jurisdictional finding is moot when the parent asserts that he or she may be barred from challenging placement in CACI as a result of the finding. (*In re D.P.* (Feb. 10, 2021, B301135) [nonpub. opn.], review granted May 26, 2021, S267429.)" (*Emily L.*, *supra*, 73 Cal.App.5th at p. 15, fn. 3.)

child is exposed to a *substantial risk* of *serious physical* harm or illness."'" (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111-112.) "Section 300, subdivision (b) does not provide for jurisdiction based on '"emotional harm."'" (*Ibid.*)

Further, "to sustain a petition under section 300, a significant risk to the child must exist '"*at the time of the jurisdiction hearing*."' [Citations.] [SSA] 'has the burden of showing specifically how the minor[] ha[s] been or will be harmed.' [Citation.] Evidence of past conduct may be probative of current conditions, and may assist [SSA] in meeting this burden. [Citations.] However, [SSA] *must establish a nexus* between the parent's past conduct and the current risk of harm." (*In re J.N.* (2021) 62 Cal.App.5th 767, 774-775, italics added.) Put differently, "'the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; "[t]here must be some reason to believe the acts may continue in the future."'" (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 23.) "'To establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur."'" (*In re Cole L.*, *supra*, 70 Cal.App.5th at pp. 601-602.) "The purpose of a dependency proceeding is to protect the child, rather than prosecute or punish the parent." (*Emily L.*, *supra*, 73 Cal.App.5th at p. 15.)

Mother's primary argument is that the petition fails to allege facts showing K.E.L. was at substantial risk of serious physical harm at the time of the hearing. Thus, we review the allegations in SSA's petition to determine whether, if proven true, they support the exercise of jurisdiction.[4] (*In re T.V.* (2013) 217 Cal.App.4th 126, 131-132; *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1136.) If the allegations are legally sufficient, then we determine whether there is substantial evidence in the record to support the court's finding that K.E.L. was at substantial risk of serious physical harm at the time of the hearing. (*In re J.N.*, *supra*, 62 Cal.App.5th at pp. 774-775.)

---

[4] Mother made an oral motion at the dependency hearing to dismiss the petition on grounds it was facially insufficient.

19

Under the substantial evidence standard, "'[w]e review the evidence in the light most favorable to the dependency court's findings and draw all reasonable inferences in support of those findings. . . . [W]e do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw.'" (*In re J.N.*, *supra*, 2 Cal.App.5th at p. 774.) While the standard is deferential, "it is not toothless. It is well settled that the standard is not satisfied simply by pointing to "'isolated evidence torn from the context of the whole record."' [Citations.] Rather, the evidence supporting the jurisdictional finding must be considered "'in the light of the *whole record*' 'to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value . . . .'" (*In re I.C.* (2018) 4 Cal.5th 869, 892.)

Here, SSA's petition for K.E.L. was based on five allegations, labeled b-1 through b-5. Only three of these allegations, b-1 through b-3, are relevant here. Allegations b-4 and b-5 concern Father's ability to protect and provide for K.E.L.

The first allegation, b-1, primarily relates to K.E.L.'s sister, L.L. It details L.L's mental health struggles and suicidal thoughts and Mother's refusal to believe L.L. or obtain treatment for her. The only mention of K.E.L. comes at the end of this paragraph, which alleges, "[a]fter [L.L.] was detained, the mother blamed [K.E.L.], for [L.L.] being detained from her custody." Nothing in this paragraph alleges or demonstrates any risk of physical harm to K.E.L. Nor does anything in the petition explain how anything in this paragraph shows a current risk of physical harm to K.E.L. Thus, this allegation is insufficient to support a jurisdictional finding under section 300, subdivision (b)(1).

Likewise, the next allegation, b-2, primarily concerns verbal and emotional abuse. Paragraph b-2 alleges Mother "has verbally and/or emotionally abused [K.E.L.] [He] reported that, on multiple occasions over his childhood, the mother had said hurtful

20

things to him including telling the child that he is a curse, a mistake, shouldn't have been born, and that he is a burden.[] [K.E.L.] also stated, 'My mom makes me feel raw inside.' On June 2, 2021, the child reported that these statements hurt him greatly when he was younger, but reported that he was no longer bothered by the mother's statements as he had grown older and had become accustomed to the mother's behavior. [K.E.L.] reported that he was unwilling to make further disclosures due to the possibility of the mother discovering what he had disclosed. The child further reported that the mother blamed the child for the sibling being detained from the mother's care."

A petition based on section 300, subdivision (b)(1) must be based on *physical harm*. It does not allow for jurisdiction based on emotional harm. (*In re Jesus M.*, *supra*, 235 Cal.App.4th at pp. 111-112.) Nor is there any allegation in the entire petition that K.E.L. is at risk to harm himself in any manner. As with paragraph b-1, nothing in paragraph b-2 indicates any risk of physical harm to K.E.L., nor does anything in the petition explain how anything in this paragraph shows a current risk of physical harm to K.E.L. Therefore, this allegation is also insufficient to support jurisdiction under section 300, subdivision (b)(1).

The final relevant paragraph, b-3, does contain allegations concerning K.E.L.'s physical safety. It alleges Mother "has undiagnosed and unresolved mental health issues. . . . [M]other also hit the child with a metal tool causing a cut on his head, and threw two glass objects at him, shattering them. [K.E.L.] reported [Mother] tried setting the couch on fire because she believes there are spirits in the furniture. [Mother] gets angry if someone uses the words 'okay,' 'beach,' or 'may.' [Mother] also becomes angry when she sees the color, purple, or the three-finger okay gesture. Another mother at the school reported she received unprovoked aggressive text messages from [Mother]. [Mother] speaks about political figures as if she has a personal relationship with them. In February 2020, [Mother] also engaged in a dispute with a flight attendant and threw something. During the law enforcement investigation, [Mother] was described as

aggressive and uncooperative.  Further, [Mother] has refused to communicate with SSA in two separate child abuse investigations, in 2017 and 2020.  On June 2, 2021, [K.E.L.] reported that [Mother] had blamed him for the sibling's detention and that [Mother's] behavior continued to be odd.  [K.E.L.] reported feeling responsible for [Mother's] wellbeing and wished to be returned to [Mother's] care as he was concerned for [her] emotional state."

Most of the allegations in this paragraph concern Mother's mental health.  While potentially relevant, the focus of a petition under section 300, subdivision (b)(1), is physical harm to the child.  "[T]he law is settled that harm may not be presumed from the mere fact of a parent's mental illness."  (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1049-1050.)  There must be some connection between the parent's mental health issues and the physical harm or risk of physical harm to the child.  (See *Ibid.*; *In re David M.* (2005) 134 Cal.App.4th 822, 830, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628.)  Likewise, Mother's altercations with other parents, SSA, the flight attendant, and law enforcement are insufficient by themselves to support jurisdiction.  There must be a connection between these incidents and the risk of physical harm to K.E.L.  (See *In re J.N.*, *supra*, 62 Cal.App.5th at pp. 775-776 [a father's commission of violent crimes was by itself insufficient to establish a risk of serious harm to his child].)

Paragraph b-3 contains some allegations of physical harm that could potentially support an exercise of the juvenile court's jurisdiction over K.E.L.  The petition alleges that Mother hit K.E.L. with a metal tool, threw two glass objects at him, and "tried setting the couch on fire" to cleanse it of evil spirits.  If proven true, these allegations could be legally sufficient to support jurisdiction.  Thus, we must review the record and determine whether there these alleged incidents provide substantial evidence to support the trial court's jurisdiction ruling.

As to Mother hitting K.E.L. with a metal tool, the February 2020 investigation found that "[t]hree years ago [(i.e., in 2017)], [Mother] hit the child [K.E.L.]

22

with some type of car tool, and he was bleeding." During the investigation, K.E.L. stated, "the metal part on the end of the tool caused a small cut on his head that bled 'just a little', but [K.E.L.] didn't think the mother intentionally tried hitting him with that metal end which caused the cut. The mother apologized to [K.E.L.]" Even if the act was intentional, it took place in 2017, four years prior to SSA's investigation in this matter.

As for the allegation regarding the glass objects, this was also uncovered by SSA in the February 2020 investigation. "[K.E.L.] said [Mother] thought he was conspiring with [Vladimir] Putin and threw a glass vase and another glass object in [his] direction breaking and shattered them. [K.E.L.] didn't think the mother was aiming at him . . . ." K.E.L. did not specify when this incident occurred. At the latest, it occurred in February 2020, which was nearly a year and a half before SSA filed its petition for K.E.L. Nothing in the petition or record establishes that Mother has engaged in any similar behavior towards K.E.L. recently or that there is a reasonable risk of recurrence.

The couch incident, like the other two incidents, was discovered by SSA during the February 2020 investigation. It occurred a year before that investigation, so over two years before the initiation of the current investigation. Significantly, Mother was not intentionally trying to set the couch on fire. Rather, K.E.L. explained Mother thought there were "spirits in the furniture and [he] was afraid [she] was going to set the couches on fire because [she] was holding burning sage in both of her hands and was trying to clear the room of the spirits. [K.E.L.] denied [Mother] tried setting the couch on fire." Nothing in the record establishes that Mother still burns sage inside the home. And even if she has continued this practice, it is not so inherently dangerous as to automatically constitute a risk of physical harm. While it certainly can be performed in a reckless or dangerous manner, nothing in the record indicates this has occurred recently.

Notably, these three incidents were all uncovered during SSA's 2020 investigation. Yet, at the time, SSA found the allegations of abuse were inconclusive and did not see "any significant negative impact to the children." SSA determined K.E.L.

23

was not at a serious risk of physical harm in February 2020.  And it has not shown why these incidents demonstrate a *current* substantial risk of physical harm to K.E.L.  (*In re Ma.V.*, *supra*, 64 Cal.App.5th at p. 23.)

We note there are other alleged incidents of physical harm contained in the record that were not included in SSA's petition.  During an interview in June 2021, L.L. "disclosed that [Mother] has . . . hit her and [K.E.L.]  [L.L.] described that [K.E.L.] 'doesn't back down from [Mother].  He gets hit a lot.  Since he's older now and stronger, he can deflect her hits.'  [L.L.] said that [Mother] last hit her, 'sometime ago because I've been really careful to not make her hit me.'"  Though phrased in the present tense, L.L.'s generalized statement does not include any temporal reference showing when these incidents occurred.  When viewed in the context of the entire record, it is apparent she is referring to past events.  First, K.E.L. had been in Illinois for school from August 2020 to May 2021, only returning home for a week for winter break.  Second, L.L. stated that K.E.L. got hit because he would not "back down" from Mother.  But K.E.L.'s recent statements show the opposite.  While he may have refused to "back down" in the past, he explained in recent interviews that he had learned to communicate with Mother without triggering her.  Third, there was no evidence of physical abuse during the current investigation.  Both L.L. and K.E.L. denied any recent physical abuse by Mother, and they had no marks or bruises.  Instead, L.L. stated Mother yelled at her or threatened to take her phone away if she got into trouble.  She also stated it had been "sometime" since Mother last hit her.  Likewise, K.E.L. stated Mother hit the children when they were younger.  Consequently, like the three incidents alleged in the petition, L.L.'s statements are insufficient to show a current risk of physical harm to K.E.L.

In short, nothing in the record shows K.E.L. faced a substantial risk of serious physical harm at the time of the jurisdiction hearing.  There were no allegations or signs of recent physical abuse by Mother toward either K.E.L. or L.L. during SSA's investigation.  Rather, all the allegations of physical harm happened in the past.  And

nothing in the record shows a substantial risk that any similar acts may continue in the future. SSA has not established a nexus between Mother's past conduct and the current risk of harm. (*In re J.N.*, *supra*, 62 Cal.App.5th at pp. 774-775; *In re Ma.V.*, *supra*, 64 Cal.App.5th at p. 23.) To the extent SSA believes Mother's mental health issues creates a risk of physical harm to K.E.L., this is unsupported by the record. As set forth above, nothing in the record shows any recent physical harm caused by Mother. Rather, the record shows K.E.L. has learned to manage Mother's mental health issues. We cannot presume K.E.L. is at a risk of serious physical harm solely based on Mother's mental state. (*In re A.L.*, *supra*, 18 Cal.App.5th at pp. 1049-1050.) And, unlike L.L, nothing in the record shows K.E.L. is suffering from any emotional distress and is at substantial risk of engaging in self-harm.

Finally, K.E.L. is not a young child. He was 16 years old at the time of the dependency hearing, two years short of adulthood. He understands Mother is triggered by certain words and actions. But he has learned to manage Mother's behavior, denies any recent physical abuse, is happy living with her, and wants to go home. (See *In re A.L.*, *supra*, 18 Cal.App.5th at p. 1051 [considering 15-year-old child's understanding of his mother's mental illness and ability to help deescalate her manic attacks].) While K.E.L.'s age and feelings toward Mother are not dispositive, they are relevant where nothing else in the record indicates he currently needs physical protection from Mother.

We understand the juvenile court's instinct to err on the side of caution and ensure that K.E.L. is physically and emotionally safe. Still, our society "'recognize[s] an "essential" and "basic" presumptive right to retain the care, custody, management, and companionship of one's own child, free of intervention by the government. [Citations.] Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship

25

only for strong reasons and subject to careful procedures.'" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530-531.) Based on the record, there were insufficient reasons for the state to intervene in the relationship between Mother and K.E.L. As such, we reverse the court's order finding K.E.L. to be subject to the jurisdiction of the juvenile court.[5]

*C. Removal of L.L.*

Mother does not dispute the juvenile court's ruling exercising jurisdiction over L.L. Rather, she appeals the portion of the court's order removing L.L. from her custody. She contends removal was unwarranted for a variety of reasons. We are unpersuaded by any of her arguments.

Children are not automatically removed from their parents' custody when deemed dependents of the juvenile court. Rather, under section 361, subdivision (c), removal is not permitted unless there is clear and convincing evidence the child fits within one or more statutory categories. Here, L.L.'s removal was based on section 361, subdivisions (c)(1) and (c)(3). The former subdivision applies when "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The latter subdivision applies where "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical

_____

[5] Because we find the court's exercise of jurisdiction was improper, we do not address Mother's arguments that K.E.L. was erroneously removed from her custody and that the court abused its discretion by ordering supervised visitation between K.E.L. and Mother.

26

custody of his or her parent . . . ." (§ 361, subd. (c)(3).) To prevail on appeal, Mother must show neither subdivision applies. (§ 361, subd. (c).)

Though we review the court's order under the substantial evidence standard (*In re Henry V.*, *supra*, 119 Cal.App.4th at p. 529), it is applied somewhat differently in the context of removal of a child given the clear and convincing standard of proof. "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. [I]n making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996; *In re V.L.* (2020) 54 Cal.App.5th 147, 155 [concluding standard of review set forth in *Conservatorship of O.B.* is controlling in dependency cases].)

First, Mother appears to imply that L.L.'s mental health had not yet reached a severe enough point to warrant removal under section 361, subdivisions (c)(1) or (c)(3). For example, she asserts "[L.L.] was experiencing emotional distress but was not immediately suicidal and had no specific plans to harm herself." But Mother provides no authority showing a child's mental state must reach such a perilous level to warrant removal under either subdivision. Rather, under section 361, subdivision (c)(3), "severe emotional damage" can be exhibited "by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others." (§ 361, subd. (c)(3).) The record shows it was highly probable that L.L. was suffering from extreme anxiety and/or depression. As detailed in the facts section above, she had expressed suicidal thoughts on multiple occasions, cried uncontrollably at times for no apparent reason, had

engaged in a form of physical self-harm (scratching herself), and had expressed thoughts of cutting herself.

Next, Mother suggests foster care is more detrimental to L.L's mental health than remaining in Mother's custody. While L.L was initially placed with a family she knew, the family informed SSA in September 2021 that they could no longer care for L.L. Mother believes that once L.L. is placed with strangers, this will be harmful to her mental health. To the extent this inquiry is relevant to our analysis, Mother's assertion is based on speculation or, at best, generalities. Rather than citing anything in the record showing L.L. has had negative experiences in any foster care placement, Mother relies on journal articles describing the potential harms of foster care. This generalized evidence is unpersuasive.

Finally, Mother makes different variations of the same argument: L.L. could have received mental health treatment while in Mother's custody, and, consequently, it was unnecessary to remove L.L. from Mother's care. But the record shows otherwise.

Significantly, Mother's refusal to allow L.L. to obtain therapy was not the only reason L.L. needed to be removed from her care. There is substantial evidence in the record showing Mother's behavior was one of the causes of L.L.'s poor mental state. L.L. disclosed to SSA that "she is 'never at ease' unless [Mother] is asleep." As L.L. described it, Mother is triggered by everything L.L. does. In addition to the various triggering words and actions outlined above, Mother even got upset at L.L. for being happy after school, assuming L.L. was "'happy because something bad happened to [Mother].'" Mother also constantly insults and belittles L.L., calling her names and even "'a whore for older men.'" Troublingly, nothing in the record shows Mother has ever acknowledged her negative effect on L.L.'s mental health. Instead, Mother's refusal to attend anger management classes and individual counseling indicates a lack of

28

accountability. Given L.L.'s current mental state, Mother's failure to accept responsibility for her conduct warrants removal under section 361, subdivision (c)(3).[6]

Moreover, Mother has consistently refused to accept the severity L.L.'s mental health struggles. The day before the protective custody order was issued, Mother "'scream[ed]' at [L.L.] asking if she was suicidal," she told L.L. "that 'everyone' feels this way," and blamed L.L.'s issues solely on school. While Mother stated she was open to L.L. attending therapy shortly after L.L. was removed from her custody, the juvenile court did not appear to find this statement genuine. We defer to its credibility evaluation. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011.) Besides, Mother's statement is undermined by her subsequent conduct. She later sent SSA a text message stating, "[L.L.] is not mental illness, so I didn't neglect. You lied, I don't trust you anymore, I refuse to be abused by your agent anymore. [¶] Fool me once is your fault, fool me twice is my fault, I am always faultless. . . ."

There is ample evidence in the record to support the juvenile court's finding that L.L. needed to be removed from Mother's custody to protect her emotional health. (§ 361, subd. (c)(3).)

---

[6] Given this finding, we need not determine whether there is sufficient evidence to justify L.L.'s removal under section 361, subdivision (c)(1), which focuses on the protection of a child's physical health.

## III

## DISPOSITION

The order finding K.E.L. subject to the juvenile court's jurisdiction is reversed, while the order removing L.L. from Mother's custody is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


SANCHEZ, J.